Thank you, Your Honor. Joe St. Louis on behalf of myself and Michael Moore for the appellate Greg Ohlson. I can see the clock and the time we have. I will ask to reserve three minutes for rebuttal. All right, counsel, watch your time. I will do that, Your Honor. Thank you. Your Honor, this is a case about a lab analyst who was told to stop advocating for improvements in his lab, was told to change his testimony, or he would be punished. He gave truthful testimony afterwards. His employer didn't like. He continued to advocate. He was constructively discharged. The lower court erred in finding the state had met its burden of establishing qualified immunity in this case. Testifying falsely can't be a job requirement. Not advocating for better science in a laboratory can't be a job requirement. To understand a little bit, Mr. Ohlson is an analyst who has over 35 years of experience. He was asked to validate new blood testing equipment for his laboratory, and he took the required, what was the floor, and he looked at things like the Scientific Working Group for Forensic Toxicology Standards, and that's at SER 452, the Society of Forensic Toxicologists Guiding Principles of Professional Responsibility, which is at ER 123, and the American Board of Forensic Toxicology Guidelines, also at SER 123. And so then he put together an email saying, these are the changes we need to make in order to make sure that we're not biased, we're not accused of manipulating data, and our test results are reliable. And he sent an email, which is SER 451 to 452, which is why we're all here today. It described a number of changes the lab needed to make to come up to these scientific standards. Judge Reyes didn't allow us to develop this, but we know that Beth Brady, his supervisor, talked, and this is at ER 287, about Greg kept coming to her, kept saying, we've got to make these changes. This is necessary. We've got to do this. And so she basically told him, you need to get out of my office. We've talked about this. But he continued to advocate. Counsel? Yes, Your Honor. Would you agree that the pivotal issue in this case is whether or not Mr. Olson was speaking as an employee or as a private citizen when he was addressing these test procedures? You know, that's certainly what Judge Reyes held was the issue that it hadn't been clearly established that... But do you agree, do you agree that that's the pivotal issue? Um, I guess I would say yes. It's the issue that was decided against us that wasn't clearly established that he was speaking as a private citizen when he was saying, we need to be transparent. We need to share all of the information that we are using with everyone else. And when he... Yes, Your Honor. Can I ask a question? Is it also true that his testimony with respect to the procedures was an important issue to the district court? Yes, Your Honor. So the district court... Go ahead. And to the defendants. Yes.  And to the defendants. And to the defendants. Um, sure. So we have an individual, he comes into court, he says, yes, good science does require you review all of the data from the blood testing, not just the 20% we give you. He's called in for this meeting on June 29th. Ms. Brady, his supervisor, said it wasn't just about his testimony, it was about everything he'd been doing, the advocacy, and then saying in court, you need these materials. That's at ER 298. That's part of her deposition testimony. Well, let me just make sure I'm clear. He was testifying in his capacity as an employee of the state of Arizona, wasn't he? He was not, Your Honor. So we have... He was not testifying in his capacity as an employee of the state of Arizona? Your Honor, and I'm flipping past it. Okay. So, oh gosh. Thank you. We have, we have Mr. Schwartz, who talks about, and this is at SCR 423, another analyst. We testify to our findings and our opinions as far as, like, the level of alcohol and what sort of impairment may be seen for the jury to understand. Right, but the only reason he was authorized to do that was because he was an employee of the state of Arizona who was charged with conducting those tests, correct? Your Honor, what Mr. Olson testified to, and this is at ER 188, is the only two times in his career he had ever been subpoenaed by a defendant to testify in court was in the Worthen and Morrell case. I think I said it, but it's at ER 188. So, Mr. St. Louis, I guess the problem I'm having listening to you is, and I've sat on You're not answering the questions with a yes or a no. You're just rambling on to something else. So, we know, we've read the briefs, we've looked at the record, that Mr. Olson was an employee of the state, that running these tests were part of his job duties, that testifying in court, that was part of his job duties. He could be subpoenaed by the prosecution or the defense. He was paid by the state while he was at court testifying. He drove a state-owned vehicle to go to court. And in the particular instance at issue, he was accompanied by another state employee while he did all of this. So, it seems like a pretty straightforward question. He's there testifying as part of his job duties. Is that true or not? And you're not answering. He was there testifying because he was an employee of the state law. That's correct, right? I don't think so, Your Honor. So, they could subpoena me off the street, and I run by the lab and pick up the reports, and then I go to court and I testify about what it means? No one's doing that. That's ridiculous. The only reason these people are testifying is because they work for this lab, they have precipient knowledge, and they are providing their expertise that they're paid for by the state to provide this information. How could that not be in the scope of his employment? Well, Judge, if you look at the Dalia case, Dalia v. Rodriguez, they talk about how speech in direct contravention to superiors' orders and the fact that the employee is threatened or harassed is strong evidence that it's not within his job duties. Now, I understand that. That's part of the problem here. But in what capacity was he testifying if he wasn't testifying as an employee? I'm trying to figure out what the position here is, because the Dalia case is a little bit different. Judge, and maybe I'm misunderstanding your question, and I apologize if I am. I'm not attempting to be evasive. He was subpoenaed because of the work he had done in the laboratory and during his testimony. You're resisting saying that, but the facts are the facts. I mean, it poses some difficulty for you, I think. But the facts are the facts. He was a state employee, subpoenaed to testify as a state employee. Now, where we go from there legally is a different issue. But I think it's difficult for you to argue with the fact that he was a state employee when he was testifying. Yes, Judge, and I'm sorry if I misunderstood your question or was thinking of something else. I apologize. He was called to testify as a representative of the state to give the test results in DUI cases. That is what his job qualifications, that's what his job description requires him to do, to testify to that. Okay, so we all agree that he was an employee of the state when he was testifying. Yes. So that takes us to the next step in why wasn't this part of his job duties such that he could be disciplined for the testimony he gave? Sure. And Judge, the short answer is because he's not a spokesperson for the government who to testify to the party line or to explain what it is that the state's position was. He was asked for his opinions and he continued his advocacy. What he did is he said, you need to be able to review all of the materials in order to make a determination. Those should be disclosed. And that's why under Dahlia, he is acting as a private citizen and not as an employee and giving that testimony because it goes beyond the scope of his obligations, the scope of what he testifies to as an analyst for the state. And that was clearly established at the time that he was testifying. Counsel, may I ask something else that was not quite clear to me in the record? He dealt with defense counsel in some of these cases, and there's evidence that he talked with defense counsel and told them, expressed to them his view that there was a better way of handling these samples. It appeared that the lawyer who was asking him these questions while he was testifying as a witness and an employee had been, he had already suggested to the lawyer that he ask him those questions. Is that fair? Yeah, it is in fact, Judge Reyes, in his opinion, when he found that Mr. Olson was speaking as a private citizen when he was both advocating, I guess, and his testimony in court, talked about he was going outside the chain of command. And that was an important determination, determining that he was speaking as a private citizen and not in his job capacity when he said that. I'm not asking you about the characterization as a private citizen. I'm just trying to figure out what he did. He did, while he was an employee, tell defense counsel that he disagreed with the way that the lab was handling this and asked the counsel to question him about this when he took the stand as an employee of the state. Isn't that true? That is true, Judge, and that was part of Judge Reyes' finding. He said he's going outside the chain of command. You don't quarrel with any of that. I'm sorry? You don't quarrel with any of that. The facts will underpin it. No, that was part of his advocacy was explaining it outside the chain of command. These are the chain. This is what we ought to be doing. This is what the defense needs to look at in this case. So we have the Dahlia case that we've talked about. You know, Judge Reyes went right down the line and did a good job. He found that Mr. Olson's speech was a matter of public concern, found that he spoke as a public citizen, found the state had not met its burden of showing an adequate basis for punishing Mr. Olson for his speech. Where the lower court erred was finding it would be reasonable for a police department to believe in 2016 that it could tell an employee to stop advocating for change and or to change his testimony. That certainly was not the case. We have Dahlia, which says, hey, you know, if you're testifying against your supervisor's wishes, that is speech as an individual, not speech as an employee. So if you directly controvert your employer's orders, you cannot be punished because you are speaking as a private citizen. That's where that seems to come out to me. And that makes no sense to me. Judge, that takes us back to footnote five of the Pickering case and Justice Marshall's determination on that point, which was that that can be taken into account as to whether or not you're competent to do your job. But that can't be taken, you can't be punished for your speech. You can never be punished for your speech. Looks to me like there's six minutes left. And counting. And I'm sorry, Judge Rawlinson, I know the calendar was confusing, but it lists Mr. Glick's as coming out of the 20 minutes for the appellant. 15 minutes for Mr. St. Louis and five minutes for Mr. Glick. No, he's, oh yes. Judge, I will reserve the remainder of my time. We simply ask you to. Oh, all right. Thank you, counsel. Thank you. We should have put 15 minutes up there in the beginning, but oh, that's okay. All right, Mr. Glick. Good afternoon, your honors. May it please the court. Colea Glick for the National Police Accountability Project. The district court correctly held that Mr. Rawlinson had a First Amendment right to testify truthfully under oath about a matter of public concern. It erred in holding that defendants are entitled to qualified immunity. I'd like to make three points today. First, that when Mr. Rawlinson took the stand and spoke about the flaws in his lab's testing policies, he testified about a matter of public concern. Second, that when Mr. Rawlinson gave his personal opinion against his supervisor's directives in that court of law, that he spoke as a citizen, not as a private, not as a government employee. And third- Counsel, what case are you relying on for that proposition that when he gave his personal opinion, he was speaking as a citizen as opposed to an employee? Your honor, I think Lane establishes that. Also, this court's case in Claremont establishes that when a citizen is testifying pursuant to a third-party subpoena, that is categorically different. The Supreme Court's held, and I'll quote United States v. Calandra, that the duty to testify has long been recognized as a basic obligation that every citizen owes his government. So this isn't just a right to testify truthfully and honestly. This is actually a duty to testify truthfully and honestly that removes it, categorically removes it from this Garcetti exception. And the rules of the courtroom really are different from the rules of an office. In a courtroom, Mr. Olson, if Mr. Olson did not appear that day, he would be punishable, punished by the court, by contempt of court. If Mr. Olson refused to answer a question against the court's directive, he would be punished by the court, not by a supervisor. And if Mr. Olson lied on the stand, as he was directed to do by his employer, he submits, then he would be punished by perjury. So this is- So if he didn't show up for court, he would be punished by his employer as well. As part of his job duties was to show up for court and testify about these lab reports. So you said he'd be punished by the court. He'd also probably be fired. I mean, it's part of his job, right? He may, Your Honor. And of course, that's not in the record here, and we don't know. But same category- Well, I'm responding to your argument, whether you're in the record or not. And in Garcetti, Justice Thomas, at least, noted that the court was not addressing what happens when you have public employees whose job duties are to testify, such as lab analysts. So I think at best for you, this has not been clearly decided, but I don't think it's been decided a different direction. I mean, wasn't- Aren't these cases, some of these cases where a person, one of them, the person was testifying or subpoenaed because they were a witness to something that happened at their place of employment, I think an employment dispute. But it really didn't have anything to do with their actual work duties. I mean, isn't that different from a person whose duty it is to represent the lab and go and present the lab's findings? Well, first, Your Honor, Justice Thomas's concurrence did not- It's not the law. It's never been applied in this circuit. It's never been applied by the Supreme Court, that there is an exception where the government can control their employees- But he didn't say that. And I didn't say that he said that. He just said, we haven't decided that. He said, we don't decide that today. Do you think he was wrong, that actually Garcetti did decide that? No, Your Honor. Well, I believe it's the Lane concurrence that we're speaking about. I don't believe Lane decided that. But I believe that this court's decision in Claremont decided that. The Seventh Circuit in Chernowski recognized as much as well. So we submit that there is a categorical exception for testimony on the stand under oath. But even if- Any kind of testimony, whether it's a fact witness or whether he's asked to give a- Well, it's just a bright line rule that any testimony is protected? Your Honor, there may be an exception that Justice Thomas alluded to that's never been applied for speaking on behalf of the government. When you're a government spokesperson, for example, representing the district attorney, representing the government in the court of law, or a 30B6 witness that the government proffers, and Justice Thomas refers to a 30B6 witness, that may be a different story. And that's not this case. In that courtroom, in the Morrell courtroom, where Mr. Olson testified, there was a government representative. That was the district attorney. Mr. Olson was speaking as a neutral witness. But more importantly, he was speaking about his personal experience. He was not purporting to represent the lab. And that's critical. And the Morrell testimony, which begins- Counsel, that can't be true that he was not purporting to represent the lab, because that was the only reason he was called to give the lab results. He was called as a representative of the lab. And that's why someone else from the lab came with him. So I don't think that argument is persuasive at all. Well, Your Honor, he may have given some testimony pursuant to his job duties, but he exceeded that, the scope of his job duties. And if there's any question about that, then it's a factual question under this court's ombud decision in Dahlia. And I'd like to refer the court to SER 568, where Mr. Olson is asked, based on your 35 years of experience, do you think, do you believe that this evidence should be provided and that full batch reports can reveal errors that individual tests cannot? And so he's giving his personal opinion. He says that it's harmful to his professional development, his professional advancement. But that opinion would have no credence if he were not employed by the state lab. Well, that's up to the court, Your Honor. That's up to the trial court. They consider that evidence to be- That's why he was subpoenaed, though. He was subpoenaed as a person who conducts these tests for the state. So you can't divorce his job responsibilities from the reason why he was subpoenaed. That's an artificial distinction, in my view. Right. Not only that, but he was answering a question that he, in the course of his job duties, told the lawyer to ask. Well, Your Honor, I think to reach that rule, we would need to have a categorical rule that any time an employee is called, and it is broadly part of their job duties to speak in a court of law, that they're categorically unprotected, that the government can dictate exactly what they say. And in Garcetti, responding to Justice Souter's dissent, the court said, we reject the suggestion that employers can restrict employees' rights. I mean, what happened here? I know you and Mr. St. Louis both have thrown around that he was directed a lie. He was told the lie under oath and furthered himself. But what the record shows to me is that the state said, you have to testify accurately and completely. So if he had set it up and told the attorney to ask him to elicit his personal opinions, and he wanted to offer those opinions, then the state expected him to say, this is not the protocol that our lab follows. Our lab's protocols are accredited by a national organization. We make these results available if they want to come see them, but we don't regularly what everyone should do with them. I know he was making PDFs of them that he was not authorized to do. You know, we don't regularly just release all of the batch, but you can see that. My personal opinion is that they should do that. I have been told we don't have the ability to do that. Whatever. He should have been more comprehensive rather than what it sounds like what he did was to say, oh, no. And I'm falling on my sword here to tell you the truth that these results are not good because this is bad for my career to say these things. And the state could reasonably say, you're there to testify about our lab results. The integrity of our lab results is critically important to us. You're not there for personal advocacy. If he wanted to be a personal advocate, he should have resigned, hung out a shingle and been hired as an expert witness to go make these kinds of arguments on behalf of one party or the other. I mean, how does what he did become private citizen speech in the context that he was in that courtroom? Your Honor, I think two answers. First, if there's a question about the scope of his job duties and there's not categorically unprotected speech, that's a question of fact. And I direct the court to ER 192 when Mr. Olson says he believed he was directed to lie. So first, it's a question of fact if there's any dispute about that and that it needs to be remanded for that reason. But I think second, anything outside him, him speaking with the attorney outside the scope of that courtroom, that's a separate question. That's a causation question. If he was terminated constructively for doing that or for the PDFs or for something that was not in that courtroom, then maybe there's a question of causation that the court can handle on remand. But what we're concerned about, what the district court is concerned about, is his testimony in that courtroom under oath. And he was asked, in your experience, have you seen errors in full batch reports that are undetectable in individual texts? And he had to answer that question, yes. Truthfully and honestly. He could answer that question, but he could also put that in context as opposed to volunteering. And by the way, this isn't good for my career and going on to make his personal advocacy speech. But in any event, I think I understand. Counsel, you've exceeded your time, so could you please wrap up? I certainly will, Your Honor. And I'll wrap up with the point that I intended to start with, which is that this really is a matter of public concern. My client is interested in this matter because it's interested in every government employee when they get on the stand telling the truth, the whole truth, and nothing but the truth. And the integrity of the system really depends on the American people knowing that government employees are not being controlled by their employer and that they are telling the entire truth, even when it is detrimental to their career interests and to their employer. All right, Counsel, thank you. You've exceeded your time. We'll hear from the State. Thank you. And may it please the Court. Michael Goodwin for the defendants, Beth Bailey, excuse me, Beth Brady, Joe Tripoli, and Vince Figarelli. Both this Court and the Supreme Court have recognized on many occasions that the government as an employer has more discretion to regulate employee speech than it does as a sovereign to regulate citizen speech. The defendants here, as you know, were supervisors at the DPS and the crime lab. They acted well within their authority in attempting to address concerns with the plaintiff, Mr. Olson, about his speech activities, including his testimony. I'd like to make this remain whole. Counsel, is it fair to say that there was a disagreement between management and Mr. Olson regarding how the results should be reported out to a defense counsel? He was advocating for all of the batch results to be released, and the supervisor said only the individual results should be released. Is that fair, a fair characterization of the dispute between them? Absolutely, it's fair. There was the difference of professional opinion, but I think the thing to keep in mind is that DPS has policies and protocols that deal with this. And the opinion that Mr. Olson was testifying to and advocating for was contrary to the crime lab's protocol, not entirely. Counsel, may I ask you, if there is a government policy, and I'm not saying that that's true in this case, but if there's a government policy that's designed to hide corruption, would your answer be the same if there's a policy that precludes public employees from testifying about corruption that they see in the workplace? Would that be unprotected speech? I think that might be. That's certainly a different case than we have here. I know that's a different case, but I'm asking you, if there's a policy in the agency that prohibits employees from deviating from that policy, and deviation from that policy would expose corruption, would your answer be the same? I don't think my answer would be the same. I cannot imagine how there would be, how a government employer would have an interest in hiding corruption. I can't imagine. Well, it happens all the time. I mean, if most of the corruption that we see is exposed by people who are on the inside, and this is the difficulty I have with this case, is that we want government employees to inform the public when there is something going wrong in the public agencies that our taxes pay for. And so, I have a dilemma in saying that the employer can dictate the extent to which the public employee can expose wrongdoing, or what that employee sees as wrongdoing. That's the difficulty I'm having with this case. Well, I would, again, just emphasize that is not this case, and we're not arguing, we're there's an employee whose job involves testimony that he's, you know, that the government has an interest in what he says. There are times where an employee might testify just to observations on the job, but that's different here. The key thing here is that Mr. Olson was testifying as a representative of the crime lab. Remember, the Murrell hearing was a hearing that was trying to get the release of the chromatograms from the batch in which the criminal defendants were included, were tested. And so, these were records that were not Mr. Olson's personal records. They were DPS's records. He was there as DPS's representative. He was the face of the department to testify about the process, how the testing was done, and what relevance, if any, those records, that that information had on the analysis. And under DPS policy, those records were not relevant to the analysis. That's why they weren't automatically produced in the first place. Why were those records irrelevant if they were part of the testing process? Why were they irrelevant? They were not part of the testing process for that particular case. But they were part of the test. They were part of the testing process for that particular case because all of those cases were put into the batch and then subsequently taken out for the individual cases. So, I'm not sure it's accurate to say that those tests were not relevant because the process began with that test being part of a number of tests in the batch. And that was the point that Mr. Olson was making, that if this test is part of the batch, then the entire batch should be turned over for independent testing to see if the results are accurate. Well, there's already quality control built into the protocol, to the analytical protocol. There's criteria for determining if the batch is test outright. That's the batch acceptance criteria. And then there's case and then there's sample acceptance criteria. And under the protocol, if the sample acceptance is within the parameters, and the batch acceptance checks out, then the sample is valid. That's without reference to the unrelated case samples because you already have that. I just don't understand the lack of transparency. Why the agency is fighting so hard for those batch samples to be excluded. I, it doesn't compute to me if the process is valid and scientifically proven, why there would be so much resistance to having all of it examined by an outside expert or by defense counsel. I don't understand why there's this big resistance to it if there is no problem with it. Well, that's the problem. It wasn't scientifically accepted that the other, that the unrelated case samples had any effect on the subject case. But the other point is, that information, the other, there was a standard disclosure made in DUI cases that included the calibrators and controls and included the subject samples from the particular case. Now, if somebody wanted to come in and inspect the other samples, they could do so. But each case stands on its own and records were separately maintained. So, but the department didn't prevent that or didn't block it. They just didn't automatically, routinely provide it. Do you know if other states use the same technique, the batch technique to analyze DUI cases? The, I don't, I don't have a great answer for that. But what I can say is that I think it is common practice to conduct tests, you know, to measure blood alcohol content of particular cases in a batch. But I do not know, to my knowledge, there's nobody else who routinely turns over the entire batch. And I will say, too, that there's, you should keep in mind about DPS. It's a state police agency. The, the samples, the blood samples they get come from all over. It could be Glendale, it could be Scottsdale, it could be, you know, some other part of the state. And so, there, I think there's some expectation that each case will be separately handled. By the agencies who send them to DPS. And so, so those, the cases from other jurisdictions could be included with Morrell's, for example. And I think the department, you know, besides the position of the lab, is that the other samples have no relevance. There's also a privacy expectation that I think plays into the whole disclosure question. Well, go ahead, Judge Schroeder. Well, I, I thought that they, they practiced that they were following, the agency was following this one that had been approved by some national organization. Am I wrong about that? No, you're absolutely right about that. The, first of all, the protocol that the department has was, it's not just handed down from Ohio. It's a sort of a collaborative. It was viewed by, you know, it's developed, you know, with many people taking part, including Mr. Olson. But then the labs, policies, procedures, and everything are vetted by an outside organization. So, it's an accredited crime lab. So, everything, the policies, everything had been approved. What was the outside organization that certified this process? The, I can only give you the initials. It's, it's now called ANAB, A-N-A-B. This is in the, and testified to, to, by Brooke Arnone, Arnone in her deposition. I think it's found in the supplemental extract of records at 410, where she talked about the, about the accrediting body. What's concerning to me about this discussion we're having is it seems like we're going a little far afield because I don't think the issue is whether Mr. Olson was correct, or whether the lab was correct, or the validity of the lab practices. You know, that's another discussion. But I don't know that that has any bearing on the First Amendment issue, and whether his speech was protected in the first instance, which we've been trying to do here. Well, it's not which one was correct. It's whether or not there was dispute, and whether or not he was being, whether or not he was being harassed. Exactly. Whether he was retaliated against. So, it doesn't matter who's correct. It doesn't, exactly. The issue is whether or not he was being silenced. Right. I understand that, Judge Rawlinson. I mean, we just had a really long, far afield discussion about the merits of the lab's practices, which to me is irrelevant to the First Amendment issue. Well, but everything that I ask about is something that's important to me in deciding the case. That's fine. So, you may think it's far afield, but for me, it's something that I take into consideration when deciding the case. I give that same liberty to every judge to explore in the way he or she thinks is most effective for them. And I appreciate that. And I'm not suggesting, I apologize, Judge Rawlinson. I'm not suggesting that there was anything wrong with the questions you're asking, that we shouldn't go there. I think it sort of started, or at least my understanding of this discussion started when Mr. Blick was speaking about some of the case law, addressing circumstances where you want government employees to be able to speak fully and truthfully, maybe whistleblower circumstances, cases of wrongdoing like case brutality. Here, maybe in a lab setting, it would be adulterating samples or falsifying lab reports, something along that nature that somebody like Mr. Olson who worked in the lab could see and know about. And do we draw a distinction between that and his opinions about the lab procedures they're following? And if he did know about those things, how is he able to speak about that? He could be a whistleblower, he could go to the OIG, he could do other things just to have that speech. And I guess that's part of what's the struggle for me is how we distinguish between the point Mr. Blick was making, that government employees should be able to speak truthfully, it's a matter of public importance and interest, versus they're not speaking for themselves, they're speaking for their employer or state agency. So Mr. Goodwin, how would you suggest we resolve that? Well, I would agree generally that employees should be free to point out if there's some corruption going on, but that wasn't involved here. And so I think this is very analogous to a 30 v. 6 type deposition that Mr. Blick brought up, where the employer has a very significant interest in consistency in its processes. And that's what distinguishes it from other kinds of situations. So that's why I'm saying we're not asking for a broad rule that every employee who speaks on the job, that the employer has no interest in that. What we're saying in this particular case, with this kind of employee, a lab employee, the DPS lab cannot testify itself. It can only perform its work, its analytical work, its testimony, that can only be accomplished through employees like Mr. Olson. And so whereas here there's a strong, compelling employer interest in the testimony, it affects how the lab operates. That is something that I think the employer has an ability to supervise. You know, there's no constitutional problem with employers supervising it. Yes, but you have to agree that the employer has no legitimate interest in having an employee testify falsely or as to matters which are unreliable. Yeah, I would agree with that. And I would also say, too, that there's no evidence here that Mr. Olson was instructed to testify falsely. He was instructed to give the lab's viewpoint, to talk about the lab's policy, to include that. Well, as I understand it, correct me if I'm wrong, I thought the reason that the lab was his testimony was that his testimony appeared to undermine the reliability of the results that the lab came to by suggesting that there was a better way of explaining what the results were and that there was no basis for undermining the lab's reliability. Am I wrong about that? No, not really. I would say it a little bit differently. I would just say that Mr. Olson was told he was entitled to his opinion. He just needed to articulate the department's view, the lab's view as well. That's what was being left out. That was creating a misleading picture of how the analysis was supposed to be done. Counsel, what is your take on how the Supreme Court's decision in Lane should play into our analysis? Well, I think it should compel qualified immunity. The Supreme Court, you know, sometimes the Supreme Court makes a holding and there's some question about how far it goes. In Lane, the Supreme Court was very clear and specifically left open the question whether an employee's testimony would be protected when given as part of the employee's job duties. That's the case we have here. By leaving that question open, that basically means that the attempt by the defendants here to address Mr. Olson's testimony violated no clearly established right. They should be entitled to qualified immunity on the second step of the analysis under Lane. The district court got that absolutely correct. Mr. Glick brought up the Claremont case. That case involved testimony, but that case is distinguishable because the testimony was not by a person who was testifying as part of their job. It was a domestic violence counselor who was called to testify. So far as it appears in that opinion, it was like a one-time thing. Not a regular occurrence has occurred here. It wasn't part of that employee's job in Claremont like it is here. And I guess I would also want to talk briefly about the... Say one word real quickly and then I'll wrap up about the consequences. If this court were to treat the plaintiff's speech as a citizen's speech, I think that would really be harmful to the state, to government employers in situations like this because basically the employer would be without recourse to address anything. It would be in effect saying you have an employee, the employee goes and testifies, you pay the employee, you compensate him for his time, for the work he does when testifying, but the employer would have no effective supervisory control over that. So if you had in this case, or in another case, if you had an employee who, say from a crime lab who just went rogue, who gave a completely unscientific opinion, if that is treated as citizen speech, then the employer would have no effective recourse to deal with it. You would just have to accept that. Anyway, I see my time is up. So I would ask that you affirm the summary judgment. Thank you, counsel. Rebuttal. Thank you, your honor. One thing that we really haven't talked about that we need to get back to is the internal advocacy portion of this because it was clearly established in 2016 in Moon and V. Tyson that if you're talking about mismanagement, that is something that you can't be chilled on. That is something that your First Amendment rights apply. That Greg Reyes dropped the ball on that, and we ask you to remand at a minimum to bring out the facts on this. When we talk about was he asked to lie, that's a question of fact that needs to be resolved by a jury, which we haven't had in this case. Originally, he's told you need to bring your testimony in line with everybody else. You will modify your testimony in such a way as to bring it into alignment with the position of the lab and the other analysts. When he says, hey, I think you're engaging in jury tampering, he's told, well, we didn't really mean that. All we meant is you are supposed to not misstate the lab's policy. Then it changes a third time to, well, really, you're supposed to volunteer that even if you're asked. These are all questions of fact. They're entitled to go to a jury. Judge Reyes erred in granting qualified immunity or finding that the government has established qualified immunity in this case, and we would ask you to reverse and remand on that. All right. Thank you, counsel. Thank you to all counsel for your helpful arguments. The case just argued is submitted for decision by the court. That completes our calendar for today, and we are in recess until 1 o'clock p.m. tomorrow afternoon. This court for this session stands adjourned.
judges: Schroeder, Rawlinson, Bade